IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TONI DIONNE MAYS HARRIS,                )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )   1:16CV1285
                                        )
NANCY A. BERRYHILL,[1]                  )
Acting Commissioner of Social Security, )
                                        )
            Defendant.                  )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Toni Dionne Mays Harris ("Plaintiff") brought this action pursuant to 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Social Security Income under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for Supplemental Security Income Benefits ("SSI") on November 9, 2012, alleging a disability onset date of October 19, 2012. (Tr. at 11, 169-177.)[2] Her claim was initially denied on February 5, 2013 (Tr. at 66-79, 97-100), and upon reconsideration on April 30, 2013 (Tr. at 80-96, 108-117). Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 11, 121-24), which she attended on October 27, 2014 (Tr. at 11, 33-58). By letter that same date, Plaintiff amended her alleged onset of disability date to May 19, 2011. (Tr. at 267-68.) At the hearing, Plaintiff requested a consultative psychiatric examination (Tr. at 11, 55-57, 598-609), which was completed in December 2014 (Tr. at 598-609). Based on the results of that examination, Plaintiff requested further evaluation to obtain a current IQ test score. (Tr. at 11, 270-71.) The testing was conducted at a subsequent consultative evaluation in March 2015, and showed Plaintiff with a full-scale IQ score of 64, verbal comprehension score of 68, and a perceptual reasoning score of 71. (Tr. at 610-15.) The ALJ ultimately issued a decision finding that Plaintiff was not disabled under the meaning of the Act. (Tr. at 11-27.) Plaintiff's subsequent request for an Appeals Council review was denied on October 5, 2016 (Tr. at 1-4), thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. Plaintiff appeals

---

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #8].

the administrative ruling, contending that she has met the requirements to establish a disability under Listing 12.05C for an intellectual disability.

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation and brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal quotation omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted).  "Where conflicting

evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

4

requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since the date of her disability application. (Tr. at 13.) At step two, the ALJ determined that Plaintiff suffered the severe impairments of:

> Bipolar Disorder; Schizoaffective Disorder; and Borderline Intellectual Functioning (20 CFR 416.920(c)).

(Tr. at 13.) However, at step three, the ALJ found that none of these impairments met or equaled a disability listing.[5] (Tr. at 14-16.) Therefore, the ALJ proceeded to determine Plaintiff's RFC, and concluded that Plaintiff retained the RFC to perform:

---

[5] "Under Step 3, the regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)). "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)).

6

a full range of work at all exertional levels but with the following non-exertional limitations: [Plaintiff] is capable of engaging in work that is limited to simple, routine, repetitive tasks. She is limited to no contact with the public, but is capable of occasional contact with coworkers and supervisors. She is capable of adjusting to routine changes in the work environment. The claimant is capable of non-production oriented work.

(Tr. at 17.) At step four, the ALJ determined that Plaintiff did not have any past relevant work. (Tr. at 25, 54.)[6] However, at step five, the ALJ concluded that "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (Tr. at 25.) Based on these findings, the ALJ concluded that Plaintiff was not disabled.

In the present appeal, Plaintiff challenges only the ALJ's determination at step three that she did not meet Listing 12.05C (Intellectual Disability), 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.05C (hereinafter "Listing 12.05C").[7] (Pl.'s Br. [Doc. #12] at 2.) At the time of the ALJ's decision, Listing 12.05C provided that:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

---

[6] The ALJ noted at the hearing that Plaintiff had no full-time work history (Tr. at 54), and the ALJ subsequently found that Plaintiff had no past relevant work (Tr. at 25). The record reflects that during the 16-year period from 1998 to 2014, Plaintiff earned more than $1,000.00 only in 2000, 2004, and 2009. In 2000, she earned a total of $1,187.87 for the year; in 2004 she earned a total of $1,313.91 for the year; in 2009, she earned $2,625.94 for the year as part of a work assistance program. In 2001, 2008, and 2010, she earned less than $250.00 per year. In 1998, 1999, 2002, 2003, 2005, 2006, 2007, 2011, 2012, 2013, and 2014, she earned nothing. (Tr. at 188.)

[7] Effective September 3, 2013, the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in the Listings. Change in Terminology: "Mental Retardation" to "Intellectual Disability", 78 Fed. Reg. 46499-01 (Aug. 1, 2013).

7

> . . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.[8] In other words, a claimant must demonstrate three elements to meet Listing 12.05C: (1) deficits in adaptive functioning manifested before age 22 ; (2) a valid IQ score of 60 through 70; and (3) another severe impairment. See <u>Luckey v. U.S. Dept. of Health & Human Servs.</u>, 890 F.2d 666, 668 (4th Cir. 1989).

In the present case, in analyzing Listing 12.05C, the ALJ concluded that (1) Plaintiff did not "have a verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function" (Tr. at 16), and (2) "the medical evidence of record is absent any other IQ testing that would show [Plaintiff] with IQ test scores below 70 prior to age 22 with the requisite adaptive deficits." (Tr. at 16.) The ALJ explained:

> Although the consultative examiner [J. Craig Hunt] found [Plaintiff] with a Full-Scale IQ score of 64, placing her in a mild deficit of intellectual functioning, [Hunt] opined [Plaintiff] with borderline intellectual functioning. He opined [Plaintiff] capable of engaging in simple, routine, repetitive work tasks based on her work history and other signs during evaluation showing [Plaintiff] not as limited as [indicated] by the test scores . . . Finally, although [Plaintiff] was diagnosed as well with bipolar disorder/schizoaffective disorder, the medical evidence of record reveals consistently, and [Plaintiff] consistently admits, that when she receives her mental health prescriptions, she is able to function

---

[8] The listings have been amended since the date of the ALJ's decision. See 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05 (effective Dec. 15, 2017, through Jan. 17, 2022); 81 Fed. Reg. 66161, 66167 (Sept. 26, 2016); <u>see generally</u> 81 Fed. Reg. 66138-01 (Sept. 26, 2016) (introductory statement regarding updates to all listings). The court reviews the ALJ's decision based on the version of Listing 12.05 in effect at the time of the ALJ's decision. Therefore, all references herein are to the version of Listing 12.05 and related regulations in effect at the time of the ALJ's decision.

without significant limitations due to her bipolar/schizoaffective disorder impairment.

(Tr. at 16). Thus, the ALJ apparently concluded that Plaintiff had failed to meet any of the three elements of Listing 12.05C. Plaintiff challenges the ALJ's adverse findings as to each element, considered in turn below.

First, with respect to the requirement that Plaintiff demonstrate an IQ score between 60 and 70, the ALJ concluded that, despite having an IQ score of 64, Plaintiff did not meet the Listing's requirement of "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr. at 16.) The Court notes that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record," but must make adequate findings to support such a determination. Hancock, 667 F.3d at 474. Plaintiff contends that the ALJ improperly invalidated her IQ scores without a sufficient basis. (Pl's Br. [Doc. #12] at 3-4). In response, Defendant does not attempt to point to substantial evidence for invalidating the IQ scores, and instead asserts that the ALJ "did not make an explicit finding that the full-scale IQ score of 64 was invalid" and that "even considering the score to be valid, Plaintiff still would not satisfy the Listing because she has failed to demonstrate the requisite deficits in adaptive functioning manifesting prior to age 22." (Def's Br. [Doc. #14] at 11.) Thus, it appears that Defendant does not dispute that Plaintiff has established this element of Listing 12.05C, and would instead contend that she has failed to meet the "adaptive functioning" element discussed below. The Court

nevertheless addresses the IQ score to the extent the ALJ may have intended to conclude that Plaintiff had not established a valid IQ score of between 60 and 70.

With respect to the IQ score, as noted above, the ALJ acknowledged that based on Dr. Hunt's testing, Plaintiff had a Full-Scale IQ score of 64, which would reflect a mild deficit of intellectual functioning. (Tr. at 16.) Dr. Hunt specifically found that Plaintiff "demonstrated adequate motivation with sufficient responsiveness to the examination process such that scores from this evaluation are considered generally valid" and "[s]he provided no indicators that suggest a need to qualify these current findings." (Tr. at 614).[9] The ALJ nevertheless appeared to discount the IQ scores, based on the assertion that Dr. Hunt "opined the claimant with borderline intellectual functioning." (Tr. at 16.) However, the regulatory requirement does not hinge on a particular diagnosis, and instead requires a valid IQ score between 60 and 70, and there is no basis to conclude that a diagnosis of 'borderline intellectual functioning' alone would invalidate an otherwise valid IQ score in the requisite range. Even more importantly in the present case, the ALJ's assertion mischaracterizes the conclusion of Dr. Hunt. Specifically, Dr. Hunt did not conclude that Plaintiff's diagnosis was 'borderline intellectual functioning' rather than mild intellectual disability. Instead, Dr. Hunt's diagnosis was "Borderline Intellectual Functioning R/O Intellectual Developmental Disorder." (Tr. at 614). Thus, Dr. Hunt concluded that Plaintiff suffered from at least borderline intellectual functioning, and that further evaluation would be needed to rule out intellectual developmental

---

[9] As a result, this case differs from Hancock, in which the ALJ concluded that "the claimant does not satisfy the requirements of 12.05C since [the consultative examiner] never stated that the IQ score was valid or that the claimant gave her best effort." Hancock, 667 F.3d at 473-74.

10

disorder.[10] The ALJ also asserted that Dr. Hunt "opined the claimant capable of engaging in simple, routine, repetitive work tasks based upon her work history and other signs during evaluation showing the [Plaintiff] not as limited as indic[a]ted by the test scores." (Tr. at 16.) However, Dr. Hunt's full conclusion states that:

> Based on intellectual scores, [Plaintiff] likely has the ability to read, write, and perform simple calculations at an elementary school level. She appears to have the intellectual capacity to perform simple, routine, repetitive tasks as well but could experience difficulty quickly as tasks become more complex. She could have moderate to marked difficulty in attempts to understand, retain, and follow instructions based on her presentation and test scores. She demonstrated adequate interpersonal behavior yet could have difficulty interacting effectively with peers, coworkers and supervisors due to complications from mood and cognitive deficits. She demonstrated marked problems with concentration, persistence, and pace based on her test scores. She could have mild to moderate or greater difficulty tolerating the stress associated with day-to-day work activity due to limited coping resources related to cognitive deficits as indicated by test scores.

(Tr. at 615.) Dr. Hunt also found that Plaintiff's general cognitive ability was in the mild deficit range, and that she "may experience great difficulty in keeping up with her peers in a wide variety of situations that require thinking and reasoning abilities." (Tr. at 614.) Contrary to the ALJ's assertion, Dr. Hunt did not note any "other signs during evaluation showing [Plaintiff] not as limited as indic[a]ted by the test scores." (Tr. at 16.) Similarly, there is no indication in Dr. Hunt's opinion that he discounted Plaintiff's IQ score based on her work history.[11]

---

[10] A consultative psychiatrist examined Plaintiff in December 2014, shortly before Dr. Hunt's testing, and similarly noted that "[g]iven the [Plaintiff's] responses during this evaluation, her estimated intellectual functioning falls in the borderline to mild intellectually disabled range." (Tr. at 598-604.)

[11] At step four of the sequential evaluation, the ALJ herself found that Plaintiff's "IQ score is inconsistent with her reports of past work experience over several years as a cashier, mill worker and in packing and shipping for Polo." (Tr. at 24) However, as noted above, the ALJ also noted no full time work history and no past relevant

11

Thus, to the extent the ALJ may have been attempting to invalidate the IQ test results based on Dr. Hunt's findings and conclusions, the consultative examination report from Dr. Hunt does not provide substantial evidence to support that determination. Plaintiff's IQ score, on its face, meets the listing requirement of an IQ score between 60 and 70, and Dr. Hunt found the score valid with no need to qualify the findings. (Tr. at 614.) Ultimately, on review of the ALJ's decision, it is not even clear that the ALJ actually intended to find the IQ test results invalid, and there do not appear to be requisite findings to support such a determination in any event. Indeed, Defendant in this appeal takes the position that the ALJ did not actually attempt to invalidate the IQ test results. Thus, there is no basis to find that this element of Listing 12.05C was not established.

The Court therefore considers the next element of Listing 12.05C, whether Plaintiff also established "a physical or other mental impairment imposing an additional and significant work-related limitation of function." As to this requirement, the additional impairment "need not be disabling in and of itself." Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir. 1985). "The inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." Luckey, 890 F.2d at 669 (internal quotation omitted).

As noted above, in analyzing Listing 12.05C, the ALJ found that Plaintiff did not "have a verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr.

---

work. (Tr. at 25, 54.) Thus, to the extent the ALJ relied on Plaintiff's work history for her determination, the ALJ failed to resolve this inconsistency.

12

at 16 (emphasis added).) Because Plaintiff had an IQ score of 64, it may be that the ALJ was instead concluding that Plaintiff failed to meet Listing 120.5C because she did not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." However, it is undisputed that the ALJ determined at step two of the sequential evaluation that the medical evidence in this case "established" that Plaintiff has severe impairments of bipolar disorder and schizoaffective disorder "which cause more than a minimal limitation in [Plaintiff's] ability to perform basic work activities." (Tr. at 13). Plaintiff contends that the ALJ's finding at step two that she has other severe impairments is conclusive of the determination to be made as to this element of Listing 12.05C. See Luckey, 890 F.2d at 669 (4th Cir. 1989). As to this issue, the Listing itself provides that "the degree of functional limitation the additional impairment(s) imposes" will be analyzed to "determine if it significantly limits [the] physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00A. In Luckey, the Fourth Circuit concluded, as is the case here, that because "the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. . . [t]he Secretary's finding that [claimant] suffers from a severe combination of impairments also established" that claimant met the additional significant impairment element of Listing 12.05C. Luckey, 890 F.2d at 669. Thus, the ALJ's determination in this case that Plaintiff did not have another severe physical or mental impairment for purposes of Listing 12.05C is inconsistent with the finding of bipolar disorder and schizoaffective disorder as severe impairments at step

two of the evaluation process. (Tr. at 16.)[12] Defendant does not address this inconsistency or otherwise contend that substantial evidence supports a determination that Plaintiff does not suffer from another severe physical or mental impairment for purposes of Listing 12.05C. Instead, Defendant contends that Plaintiff fails to meet Listing 12.05C in any event because she has not established deficits in adaptive functioning manifested before age 22. The Court therefore turns to that final element of Listing 12.05C.

With respect to this final element of Listing 12.05C, the ALJ concluded that Plaintiff had not established deficits in adaptive functioning manifested before age 22 because "the medical evidence of record is absent any other IQ testing that would show the claimant with IQ test scores below 70 prior to age 22 with the requisite adaptive deficits." (Tr. at 16). However, as noted by Plaintiff, a failure to secure IQ scores during the developmental period,

---

[12] Moreover, Plaintiff's medical records establish a significant history of serious mental health issues. As of March 2011, Plaintiff had a history of at least five in-patient hospitalizations for psychiatric issues dating back to 2005. (Tr. at 426-30.) Records indicate that in August 2008, Plaintiff was admitted to the Danville Regional Medical Center under a temporary detention order "on account of exacerbation of psychosis with agitation, verbalization of persecutory ideas, and rather disconnected thought process, labile affect, and apparently unable to take care of herself." (Tr. at 292-295.) She was diagnosed with schizoaffective disorder, bipolar type. (Tr. at 293.) Records also indicated a prior hospitalization in 2005 under "similar circumstance." (Tr. at 292-295.) In 2010, Plaintiff was involuntary committed to a treatment facility for bizarre behavior and reported hearing voices (Tr. at 393-398). In addition, in 2012, Plaintiff "was brought into the ER by the police as she cut her wrist and was running in the street. Initially the patient was very disorganized, paranoid, unable to provide logical history." (Tr. at 507.) The ALJ asserted that "the medical evidence of record reveals consistently, and the [Plaintiff] consistently admits, that when she receives her mental health prescriptions, she is able to function without significant limitations due to her bipolar/schizoaffective disorder impairment." (Tr. at 16, 42-44.) However, Plaintiff's medical records reflect that Plaintiff has had difficulty maintaining compliance with taking medications due to multiple factors, including side effects, cost, and as a result of the nature of her mental impairments. See Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse" and "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." (internal quotations omitted); Preston v. Heckler, 769 F.2d 988, 990-91 (4th Cir. 1985).

14

by itself, is not fatal to Plaintiff's claim. See Branham, 775 F.2d at 1274. "The Secretary's regulations expressly define mental retardation as denoting 'a lifelong condition.'" Id. (quoting 20 C.F.R. subpart P, Appendix 1 § 12.00(B)(4)). As noted by the Fourth Circuit in Branham, "there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation." Id.

In considering Listing 12.05, the ALJ also noted that "[t]he evidence from [Plaintiff's] high school shows only that she was passing most subjects in ninth grade and fails to document any IQ testing or inclusion in a special education program." (Tr. at 16). In her later analysis, the ALJ stated that Plaintiff:

> reported leaving school in ninth, eleventh and twelfth grades due to a pregnancy at different assessments [and] reported she had average grades. . . . Notably, educational records from the [Plaintiff's] ninth grade year show [Plaintiff] passing all subjects except Earth Science, including World History, Chorus, Health/ Physical Education, Basic English, Basic Math, Navy ROTC, World of Construction, and Textiles and earning credits for each toward graduation. The school records do not indicate [Plaintiff] was included in any special education classes and fail to show any indication that [Plaintiff] had an Individualized Educational Plan.

(Tr. at 22.) However, the school records do not support, and appear to contradict, the ALJ's conclusions. Plaintiff's Secondary School Transcript reflects Plaintiff failing, or not receiving credit for, ninth grade Math and English (1990-1991 school year), and transferring to an alternative school (Phoenix) to repeat 9th grade core classes (September 1991- January 1992) where she took Basic Math and Basic English and received grades of 71 and 70, but failed Earth Science. (Tr. at 279.) The records also reflect that Plaintiff then transferred to George Washington High School in January 1992, for 10th grade. (Tr. at 279-280.) However, she

15

received a 53 in English 10 and a 56 in Math, and received credit only for Choir and Physical Education. She returned the next year for 11th grade but was also repeating 10th grade English, and she failed English 10, English 11, Math, Chemistry, and Health. (Tr. at 279.) Plaintiff's academic records also include standardized test scores for 9th and 10th grades, placing her consistently in the very low percentiles, with her total score reflecting a national percentile of the lowest 1% on the final test in 10th grade. (Tr. at 280.) The ALJ did not discuss this evidence, and the ALJ's summary of the school records does not fairly reflect the significant academic difficulties reflected there. Finally, the Court notes that while Plaintiff's school records do not expressly mention special education classes, Plaintiff's multiple school transfers, poor grades, the various letter designations on the classes on her transcript, and the low standardized test results appear consistent with Dr. Hunt's notation that Plaintiff represented that she attended "special classes throughout her education." (Tr. at 610-615.) Thus, the school records do not provide substantial evidence to support the ALJ's conclusions that Plaintiff failed to show any deficits in adaptive functioning prior to age 22.

The Court also notes that the Commissioner contends that the ALJ found more generally that Plaintiff did not suffer deficits in adaptive functioning as an adult, and this this finding provides a separate basis for concluding that Listing 12.05C was not met. However, the ALJ did not make this finding as a basis for concluding that Listing 12.05C was not met.[13]

---

[13] In Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726 (M.D.N.C. Mar. 25, 2014) the Court noted that "[r]eview of the ALJ's ruling is limited further by the so-called '*Chenery Doctrine*,' which prohibits courts from considering *post hoc* rationalizations in defense of administrative agency decisions. . . . Under the doctrine, a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency. . . . If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.' " Id. at *1 (quoting Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194 (1947)). In applying this doctrine in Anderson, the Court noted that

Moreover, the regulations in effect at the time of the ALJ's decision do not "expressly define 'deficits in adaptive functioning' or specify the degree of deficit required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." Blancas v. Astrue, 690 F. Supp. 2d 464, 476-477 (W.D. Texas 2010). Nevertheless, adaptive functioning analysis "entails a fact-intensive inquiry concerning the ability of the claimant to cope with common life demands and achieve certain standards of personal independence." Salmons v. Astrue, No. 5:10CV195, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 Fed. Appx. 214, 218 (4th Cir. 2012) (citing Atkins v. Virginia, 536 U.S. 304, 309, n.3 (2002)). In this case, the ALJ specifically found that Plaintiff suffered from both moderate limitations in concentration, persistence, and pace, and moderate limitations in social functioning. (Tr. at 15.) These findings suggest adaptive deficits which the ALJ has not addressed in the context of applying Listing 12.05C. See Ollice v. Colvin, No. 1:15CV927, 2016 WL 7046807 (M.D.N.C. Dec. 2, 2016); Adams v. Colvin, No. 1:15CV733, 2016 WL 6238559 (M.D.N.C. Oct. 25, 2016); Rothrock v. Colvin, No. 1:13CV497, 2016 WL 1175189, at *7 (M.D.N.C. Mar. 23, 2016) ("[T]he ALJ did find Plaintiff to have moderate difficulties in social functioning and in concentration, persistence, or pace. These findings tend to contradict

---

"jurisprudence on this issue is far from clear," and "this court will err on the side of caution" and avoid "excessive intrusion into the ALJ's domain." Id. at *3.

the ALJ's determination that Plaintiff has no significant deficits in adaptive functioning." (internal quotation omitted)). In addition, all three consultative examiners who examined Plaintiff concluded that she would be unable to manage an award of benefits herself and would need supervision in using her benefits in her best interest. (Tr. at 430, 603, 615, 620.) The 2011 consultative examination found that Plaintiff had below-average intelligence and was not able to care for herself or her children and "not able to function, not able to work." (Tr. at 430.) In addition, a November 2012 comprehensive clinical assessment by a treating provider noted that she "has difficulty with simple math," she "cannot balance a check book," she "cannot read a book," she attempts to minimize her symptoms because she is trying to regain custody of her children from her mother, and she had "documented, significant impairment in the following life domains, emotional, social, safety educational, vocational, and legal" with a GAF score of 49. (Tr. at 455-456.) Finally, as noted above, Dr. Hunt concluded in March 2015 that Plaintiff could read and write at an elementary school level and could perform "simple calculations" at an elementary level. (Tr. at 614.) Dr. Hunt also found moderate to marked difficulty in attempts to understand, retain, and follow instructions and marked problems with concentration, persistence, and pace. (Tr. at 615.) The ALJ addressed some of this evidence in setting the RFC, but the ALJ did not conclude that Plaintiff had shown no deficits in adaptive functioning for purposes of Listing 12.05C, nor did the ALJ otherwise address the evidence in a way that would build a "logical bridge" to support such a determination. Indeed, as discussed at length above, with respect to the findings and conclusions actually reached by the ALJ in undertaking the Listing 12.05C analysis, the ALJ's findings are not supported by substantial evidence and are actually in conflict with the evidence

in the record. Therefore, remand is necessary to allow the ALJ an opportunity to to more fully address the provisions of Listing 12.05C in the context of the evidence presented in this case.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and Plaintiff's Motion for Judgment [Doc. #11] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 6th day of March, 2018.

                                                        /s/ Joi Elizabeth Peake
                                                       United States Magistrate Judge